CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

February 24, 2025
LAURA A. AUSTIN, CLERK
BY:
s/B. McAbee
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DAPHNE K., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:23cv00024 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| LELAND DUDEK, | ) | |
| Acting Commissioner of Social Security, | ) | By:    Joel C. Hoppe |
| Defendant.[1] | ) | United States Magistrate Judge |

Plaintiff Daphne K. ("Daphne") asks this Court to review the Acting Commissioner of

Social Security's ("Commissioner") final decision denying her claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 404–434. Compl., ECF

No. 2. The case is before me by referral under 28 U.S.C. § 636 (b)(1)(B). Having considered the

administrative record ("R."), ECF No. 7; the parties' briefs, ECF Nos. 13, 17; and the applicable

law, I find that substantial evidence supports the conclusion that Daphne's medically

determinable impairments ("MDIs") were not "severe" during the relevant time. R. 513–29.

Accordingly, I respectfully recommend that the presiding District Judge affirm the

Commissioner's final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it

cannot "reweigh conflicting evidence, make credibility determinations, or substitute [its]

judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

---

[1] Acting Commissioner Leland Dudek is hereby substituted as the named Defendant in this action. 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings and final decision. *Rogers v. Kijakazi*, 62 F.4th 872, 875 (4th Cir. 2023); *see Jade M. v. Comm'r of SSA*, No. 7:23-cv-221, 2025 WL 18620, at *2 (W.D. Va. Jan. 2, 2025) (explaining standard).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

To receive social security disability benefits under the Social Security Act, a person must prove they are "disabled." *Britt v. Saul*, 860 F. App'x 256, 257 (4th Cir. 2021). A person is "disabled" under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. *See Heckler v. Campbell*, 461 U.S. 458, 460–62

(1983). The ALJ asks, in sequence, whether the claimant:

> (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

*See id.*; *Barbare v. Saul*, 816 F. App'x 828, 831 (4th Cir. 2020); 20 C.F.R. § 404.1520(a)(4).[2]

The claimant bears the burden of proof through step four. *Barbare*, 816 F. App'x at 831. At step

five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.* If an

individual is found not disabled at any step, the analysis ends. *See id.*

For step two, an impairment is "severe" if it "significantly limits [a claimant's] physical

or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a) (defining "Non-severe

impairment(s)"). Put differently, an impairment is not severe if it has "no more than a minimal

effect on the individual's ability to work." *Koisch v. Astrue*, 650 F. Supp. 2d 475, 484 n.14 (E.D.

Va. 2009); *see also* SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985).

## III. Procedural History

In January 2018, Daphne filed for DIB. *See* R. 84, 680. Daphne alleged that she had been

disabled since January 1, 2011, because of "strokes and mental impairments." R. 84, 86. On the

initial review, Virginia Disability Determination Services ("DDS"), the state agency, determined

that the relevant period for Daphne's DIB claim ran from January 1, 2011, her alleged onset date

("AOD"), to December 31, 2011, her date last insured ("DLI"). *See* R. 83–87.[3] DDS denied her

claim because the "evidence in the file is not sufficient to fully evaluate" her medical

"impairments prior to [the] 12/31/2011 DLI." R. 89; *accord* R. 86–87. However, the medical

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final decision.

[3] To qualify for DIB, Daphne must prove that she became disabled on or before her DLI. *See Johnson*, 434 F.3d at 655–56; 20 C.F.R. §§ 404.101(a), 404.131(b).

experts who reviewed Daphne's file for DDS did find that her hypertension, gastrointestinal disorder, and depressive, bipolar, and related disorders, were "severe" impairments during the relevant period. R. 87. On reconsideration, DDS again determined that Daphne's impairments were "severe," R. 98, but it denied Daphne's claim because of "insufficient evidence" to fully evaluate her claim prior to her DLI, R. 99. *Accord* R. 96–100. In July 2019, Daphne appeared with counsel and testified at a hearing before ALJ Suzette Knight. R. 25–41. A vocational expert ("VE") also testified. R. 42–46.

ALJ Knight issued an unfavorable decision on August 6, 2019. R. 15–21. At step one, she found that Daphne "did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2011 through her date last insured of December 31, 2011." R. 17. At step two, ALJ Knight found that Daphne had the following medically determinable impairments ("MDIs") during this relevant period: "hypertension, obesity, depression and bipolar disorder." *Id.* However, ALJ Knight concluded that through Daphne's date last insured, she "did not have an impairment or combination of impairments that significantly limited [her] ability to perform basic work-related activities for 12 consecutive months," and thus did not have a "severe" impairment or combination of impairments before her DLI. *Id.* Having found no "severe" MDI during the relevant period, ALJ Knight denied Daphne's DIB claim at step two of the five-step disability determination. *See* R. 17–21. The Appeals Council declined Daphne's request for review, R. 1–6, thereby making ALJ Knight's denial the final decision of the Commissioner. R. 1.

Daphne appealed, R. 568–69, and this Court reversed the denial of DIB "and remand[ed] the matter under the fourth sentence of 42 U.S.C. § 405(g)." *See Daphne K. v. Kijakazi*, No. 4:20-cv-49, ECF No. 20 (W.D. Va. Jan. 4, 2022) (Order adopting report & recommendation); R.

570–88. This Court found that ALJ Knight erred by failing to address relevant medical evidence. R. 587. First, this Court concluded that ALJ Knight erred when she failed to mention the report of Franklin E. Russell, Ph.D., "at any point in her decision. R. 583. Second, ALJ Knight erred when she did not explain why her severity findings conflicted with the DDS psychologists' severity findings. R. 587. The Appeals Council vacated the final decision and remanded the case to ALJ Knight. R. 589–93.

On remand, ALJ Knight held a telephonic hearing in February 2023. R. 530–48. Daphne appeared with counsel and testified. R. 537–45. A VE also testified. R. 545–48. ALJ Knight issued another unfavorable decision in March 2023. *See* R. 516–25. At step one, she determined that Daphne "did not engage in substantial gainful activity during the [relevant] period from her alleged onset date of January 1, 2011, through her date last insured of December 31, 2011." R. 519. At step two, ALJ Knight found that Daphne had the following MDIs: hypertension, obesity, depressive disorder, alcohol use disorder, and bipolar disorder. *Id.* However, ALJ Knight again concluded that none of these MDIs, or combination of MDIs, "significantly limited [Daphne's] ability to perform basic work-related activities for 12 consecutive months." *Id.* She thus concluded that Daphne was not disabled before her insured status expired on December 31, 2011. *Id.* The Appeals Council found "no basis for changing the [ALJ's] decision," and declined to assume jurisdiction, making it the final decision of the acting Commissioner. *See* 20 C.F.R. § 404.984(a) (ALJ decision is final decision of the Commissioner "after remand . . . unless the Appeals Council assumes jurisdiction of the case.").

### III. Discussion

Daphne first argues that the ALJ erred by finding that Daphne's depressive disorder and bipolar disorder were not severe. Pl.'s Br. 6. According to Daphne, the medical evidence

satisfied the *de minimis* standard. *Id.*

Second, she argues that ALJ Knight erred by concluding that the DDS medical experts' opinions—which labeled Daphne's MDIs "severe" before her DLI—were unpersuasive. *Id.* at 6–7. She contends that ALJ Knight "committed reversible error by finding that" the experts "failed to provide adequate support for finding [Daphne's] impairments severe." *Id.* at 8.

Next, Daphne challenges ALJ Knight's conclusion that Dr. Russell's post-DLI exam was unpersuasive. *Id.* at 8–11. Daphne contends that ALJ's Knight's three reasons for rejecting Dr. Russell's opinion are "unsustainable." *Id.* Daphne argues that ALJ Knight's first reason to reject Dr. Russell's opinion—because the exam was post-DLI—is error because there is a sufficient link between her post-DLI state of health and pre-DLI condition. *Id.* at 8–9. Daphne argues that ALJ Knight's second reason to reject Dr. Russell's opinion—because it is based on Daphne's subjective statements—is error because it is "spurious" and, in any event, "there is absolutely no reason to doubt what [Daphne] told Dr. Russell." *Id.* at 9–10. Daphne contends that Dr. Russell is a trained psychologist and did not base his opinion solely on her statements. *Id.* Finally, Daphne argues that ALJ Knight's third reason to reject Dr. Russell's opinion—because it was inconsistent with the evidence that Daphne did not seek treatment for her mental MDIs during the relevant period—is error because "under SSR 16-3p, the ALJ may not draw an adverse inference from such evidence 'without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.'" *Id.* at 9 (citing SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016)). In other words, Daphne argues that ALJ Knight may not draw an adverse inference from her lack of mental-health treatment because Daphne's "inability to afford a higher level of care was the issue." *Id.* at 9–10 (citing R. 250).

*A.    Summary*

1.    *Medical Records*

On August 25, 2008, prior to her alleged onset date of January 1, 2011, Daphne presented

to the emergency department at Community Memorial Pavilion for a psychiatric evaluation with

Masoud Hejazi, M.D. R. 203–04. Daphne complained that she was "upset with [her] husband"

after learning that he got his mistress pregnant. *See* R. 203. Daphne had "been feeling down in

the dumps, dysphoric, moody, agitated and had [a] brief physical confrontation with her

husband." *Id.* She denied any delusions, paranoia, or hallucinations, but she thought she might

suffer from bipolar disorder, which prompted her to seek "admission to [inpatient] psychiatric

services." *Id.* She also reported "problems with concentration and memory" and "feeling

fatigue[d] and tired." *Id.* Dr. Hejazi noted that Daphne looked "[d]isheveled, unkempt," and

"older than her chronological age," was "extremely dysphoric and sad," and "seem[ed]

bewildered and overwhelmed by her relationship with her husband." *Id.* Daphne's speech was

coherent and appropriate, her "frame of thought and thought content were intact," her intellectual

"and cognitive functioning seem[ed] to be around average," and she was "not psychotic." *Id.* Dr.

Hejazi diagnosed Daphne with: (1) major depressive disorder recurrent, severe; (2) bipolar

disorder, NOS (provisional); and (3) alcohol dependence vs. abuse. R. 203–04. For treatment,

Dr. Hejazi ordered that Daphne be admitted to Pavilion "to participate in milieu therapy" for five

to seven days, "medication management will be implemented," and Daphne would continue

treatment on an outpatient basis. R. 204.

On August 30, 2008, Daphne was discharged from Pavilion, and Veeraindar Goli, M.D.,

completed her discharge report. R. 205–07. Dr. Goli noted that Daphne "reportedly has

significant mood swings that [other providers] believe has been untreated bipolar disorder and

she reportedly drinks much more heavily just before a manic or hypomanic 'energy burst.'" R.

206. At discharge, Daphne "remained somewhat disheveled, looking older than her chronological age," but she exhibited "good eye contact," a "cooperative attitude," fluent speech, "fair" insight and judgment, and "intact" memory with no signs of confusion. *Id.* She "denied depression and stated that she was calm although at times during the conversation she was irritable." *Id.* She also "remained quite distracted about the relationship with her husband." *Id.* Dr. Goli instructed Daphne to continue her Cymbalta and Seroquel and to consider "intensive one to one counseling perhaps as often as twice weekly to start." R. 207. Her prognosis was "guarded." *Id.*

On December 7, 2010, Daphne saw her primary care physician William Jones, M.D., "complaining of a pounding in her head and fatigue." R. 234. Daphne was uncertain what caused her issues, but she told Dr. Jones that her "tumultuous divorce . . . caused her much distress." *Id.* Daphne felt "like she probably need[ed] to get back on Cymbalta which she took in the past for depression," and Dr. Jones ordered her to resume Cymbalta. *Id.*

In August 2011, Daphne saw Donald Carwile, M.D. Dr. Carwile noted that Daphne was "[a]lert, pleasant," and in "no distress." R. 233. In October and December 2011, Daphne saw Dr. Jones, who noted that Daphne's "[a]ffect [was] appropriate" during the mental status exam. R. 228, 221. Daphne also saw Richard Newton, M.D., in December 2011. Dr. Newton noted that Daphne was "[a]wake, pleasant, cooperative, oriented." R. 281.

After her DLI, Daphne saw Dr. Russell for a consultative psychological exam on November 1, 2012. R. 249–54. Daphne reported that she last worked "in 2008 or 2009 before '[her] last breakdown,'" and that she had not worked since that time because, she "'just can't deal with it. It's too much.'" R. 250. When asked about mental health treatment, Daphne said that "she is supposed to be on Cymbalta and some other type of medication but . . . cannot afford

it" and that "she has been hospitalized three times for depression and suicidal ideation." *Id.* Dr.

Russell noted, "she indicated she has not quite been the same since the dissolution of her last

marriage and also her mother died about the same time." R. 251. When asked about friends she

sees regularly, Daphne said she "[does not] care . . . about friends" and "said there is nothing that

she currently enjoys or finds pleasure in." *Id.* When asked how often she experienced crying

spells, Daphne said she has them "[s]ometimes every day, then it's every other day," after she

"split up with [her] husband and [her] mommy died." R. 252. When asked why she was unable to

obtain or maintain employment, Daphne responded, "'I just can't deal with people. I really don't

know what to tell you. The truth is I don't want to go anywhere or be around anybody.'" R. 253.

On exam, Dr. Russell found that Daphne was cooperative, seemed to give her best effort,

and related "in a matter of fact and business-like fashion" without exhibiting signs of

evasiveness, suspiciousness, distractibility, or hostility. R. 251. She had a "restricted" affect and

"depressed" mood, *id.*, and she "started to get upset" and "appeared in some minor distress"

when asked about past homicidal ideation, R. 252. Her memory was "fair" to "good," her

judgment and insight were "fair," and her "[a]bstract reasoning ability was poor." R. 252–53. Dr.

Russell opined that Daphne gave fairly reliable information "with no evidence of malingering."

R. 253. "Based upon the mental status evaluation," Dr. Russell opined that Daphne:

> most likely has the intellectual ability to perform detailed and complex tasks, but
> due to her depressed mood, difficulty concentrating, and preoccupation with her
> own misery, it is unlikely that she would be able to perform such tasks consistently.
> She would even have difficulty performing simple repetitive tasks, maintaining
> regular attendance in the workplace, and performing work activities on a consistent
> basis. There was nothing revealed to indicate that she would require special or
> additional supervision. [Her] depressed mood and the accompanying symptoms
> would probably preclude her from completing a normal workday or workweek
> without interruptions. She appears fully capable of accepting instructions from
> supervisors and interacting with coworkers and with the public.

*Id.* Dr. Russell did not explicitly indicate that these abilities and limitations reflected Daphne's

mental functioning before her DLI, except to note that there "appears to be some evidence of her fragility even prior to [her] last divorce." *Id.* In the diagnostic rationale portion of the report, Dr. Russell noted that he "suspects with some mental health treatment [Daphne's] depressed mood can improve. Currently, though, her depressed mood and her preoccupation with her own misery precludes her from being able to focus long enough to perform anything but the most menial tasks." *Id.*

DDS psychologists Jo McClain, Psy.D., and Leslie Montgomery, Ph.D., reviewed Daphne's medical records in March 2018 (initial review) and June 2018 (reconsideration), respectively. *See* R. 84–88, 96–99. Dr. McClain concluded there was "insufficient evidence in [the] file to fully evaluate" Daphne's mental impairments prior to that date because her record contained "no functional information or detailed mental status exams" dated after December 2010. *See* R. 86–87. Dr. McClain cited the paragraph B criteria—for determining the functional loss related to Daphne's depression and bipolar disorder—and concluded that there was "[i]nsufficient [e]vidence" to rate the degree of Daphne's pre-DLI limitations in each category. Nonetheless, Dr. McClain opined that Daphne had "severe" MDIs of "Depressive, Bipolar and Related Disorders" and "Substance Addiction Disorders (Alcohol)" before her insured status expired on December 31, 2011. *See* R. 86–87. Dr. McClain concluded there was "insufficient evidence in [the] file to fully evaluate" Daphne's mental impairments prior to that date because her record contained "no functional information or detailed mental status exams" dated after December 2010. *See* R. 86–87. Dr. McClain cited the paragraph B criteria—for determining the functional loss related to Daphne's depression and bipolar disorder—and concluded that there was "[i]nsufficient [e]vidence" to rate the degree of Daphne's pre-DLI limitations in each category, *id.*, and "the evidence needed cannot be obtained," *id.* at 89.

On reconsideration, Dr. Montgomery generally agreed with Dr. McClain's assessment after reviewing Daphne's records in June 2018. *See* R. 98 (finding "severe" impairment of "Depressive, Bipolar and Related Disorders," but concluding there was "insufficient evidence in [the] file to fully evaluate [Daphne's] mental impairments prior to 12/31/2011 DLI. There is no functional information or detailed mental status exams."). Unlike Dr. McClain, however, Dr. Montgomery specifically considered Dr. Russell's medical opinion that Daphne's "depressed mood and her preoccupation with her own misery preclude[d] her from being able to focus long enough to perform anything but the most menial tasks" and that there "appear[ed] to be some evidence of [Daphne's] fragility even prior to [her] last divorce." R. 95 (citing R. 253). Dr. Montgomery found that Dr. Russell's "opinion [was] supported by medically acceptable clinical and laboratory diagnostic techniques, and [was] consistent with other evidence in the file." R. 99. Like Dr. McClain, Dr. Montgomery cited the paragraph B criteria and concluded there was "[i]nsufficient [e]vidence" to rate the degree of Daphne's pre-DLI functional limitations in each category. *Id.* at 98.

2.    *Daphne's Statements*

Daphne testified at the hearing before ALJ Knight in July 2019. R. 28–41. Asked why she could not work in 2011, Daphne said that "something really bad happen[ed]" to her in 2009–2010 and that she "just couldn't deal with" working anymore. R. 36 ("I had always worked two jobs all my whole life and then this happened and I just couldn't deal with it."). She explained, "I just couldn't concentrate, I couldn't deal with the public . . . . I didn't want to go out of the house." *Id.* Daphne initially got "medicines and help from the psychiatric place" after the "traumatic event." R. 37. She did not see a mental health professional in 2011, *see* R. 37–38, but she did take antidepressants prescribed first by providers at "the Southside mental facility, and

then [by her] regular doctor," R. 40. Daphne did not have health insurance at the time. R. 41.

Asked to describe a typical day in 2011, Daphne said, "I would get up and fix coffee and just

watch television, and maybe do some dishes or something like that until time to go to bed, that's

about it." R. 38. She further testified that she did some cooking, cleaning, and laundry during

2011 and that her son paid her bills and visited her at home. R. 38–39. Daphne left her house at

most "two or three times a week," usually "just to [drive to] the grocery store." R. 33; *see* R. 39.

She did not go out to visit friends or family, engage in any social activities like going to church,

or have any hobbies. R. 39.

On remand, Daphne testified again before ALJ Knight. R. 531–48. Between January

2000 and January 2007, Daphne worked as a clerk at a convenience store, where she "waited on

customers and managed the files." R. 539–40. The most weight she lifted while working was ten

or 15 pounds. R. 540. After 2007, Daphne was supported by her son and has not applied for any

jobs since the alleged onset date of January 1, 2011. R. 540. When asked how often she drives,

Daphne said "once a month" to the store. R. 538. When asked what she likes to read, Daphne

stated "I read texts some but that's pretty much it." R. 539. Daphne further testified she can

count change to make sure it is correct and can manage her checking account. R. 539.

When asked why she could not work, Daphne described her mental and physical

impairments. R. 540–41. Daphne explained that, with her surgeries and stroke, she "couldn't

concentrate" or "be around people," or "really do much of anything." R. 540. Even prior to the

stroke, Daphne had trouble concentrating when around other people, and generally "couldn't

tolerate" being around others. R. 541. She did receive treatment from a mental health

professional "in the past," "when [she] was admitted to a psychiatric place" for a couple of

months. R. 543. Since Daphne's stay at the psychiatric facility, she has not been hospitalized

related to her mental impairments. R. 544. She takes mental health medications prescribed by her

primary care doctor. *Id.* Regarding physical impairments, Daphne acknowledged that she "didn't

have a lot of physical disabilities" prior to the stroke, but after the stroke, her physical

impairments prevented her from being able to lift items. R. 541. She further explained that she

cannot walk or stand for a certain amount of time. *Id.*

> When asked to describe a typical day, Daphne said:

> I get up, I fix coffee. I make my bed. I watch TV, fix breakfast, and which most
> time it's late, so I fix dinner, and then I can dust the furniture and wash my clothes
> if I have to that day, watch TV and then I go to bed.

R. 542. She further testified that she does not have problems with personal care during the day;

however, someone else does certain household chores, like gardening, mowing the lawn, and

shoveling the snow. *Id.* She is responsible for paying her bills. R. *Id.* She shops for groceries

"once every two months," but does not engage in social activities "like going to church, the

movies, or the mall." *Id.* Nor does she have any hobbies. *Id.* She does, however, have a small

dog she takes care of. R. 543.

B.       *The ALJ's Decision on Remand*

    After the hearing, ALJ Knight issued another unfavorable decision. R. 513–29. At step

one, ALJ Knight determined that Daphne "did not engage in substantial gainful activity during

the period from her alleged onset date of January 1, 2011, through her date last insured of

December 31, 2011." R. 519. At step two, she found that Daphne suffered from the MDIs of

depressive disorder and bipolar disorder. *Id.* ALJ Knight concluded that through her date last

insured, neither MDI, alone or combined, "significantly limited [Daphne's] ability to perform

basic work-related activities for 12 consecutive months," and thus Daphne did not have a severe

impairment or combination of impairments. *Id.*

13

Discussing Daphne's mental impairments, ALJ Knight first noted that during her 2008 inpatient treatment for depression and bipolar disorder, Daphne "was disheveled, extremely dysphoric, bewildered, and overwhelmed but . . . was coherent with appropriate speech, and her thought content was intact," and Daphne "denied hallucinations, delusions, or paranoia." R. 521 (citing R. 202–07). ALJ Knight also noted that after the 2008 inpatient treatment, the "[m]ental status portions of [Daphne's] examinations were unremarkable with [Daphne] being described as alert, pleasant, and smiling." *Id.* (citing R. 216–47). She "was prescribed medications for depression from her primary care provider on and off from 2008 to 2011." *Id.* ALJ Knight concluded her analysis of Daphne's pre-DLI medical records by finding that while Daphne received inpatient treatment years before her AOD, Daphne "did not receive any [outpatient] therapy . . . , nor was she psychiatrically hospitalized during the period at issue," and no provider "assigned functional limitations secondary to the claimant's mental health condition" before her DLI. *Id.*

ALJ Knight then summarized Daphne's post-DLI evaluation with Dr. Russell in November 2012. ALJ Knight discussed Dr. Russell's findings and opinion. At that time, Daphne was not taking any psychiatric medications because she was unable to afford them. *Id.*  Daphne exhibited a depressed mood and restricted affect, but "there was no evidence of restlessness or distractibility," "there was no sign of a psychotic process," and "[h]er thought processes were organized, logical, and coherent." *Id.* Daphne's "immediate and remote memory were good," she had "fair recent memory," she had "fair" "judgment, insight, and common sense," but her "fund of knowledge was poor." *Id.* Dr. Russell opined that Daphne's "depressed mood could improve" with some "mental health treatment."

In concluding that Daphne's MDIs were not severe prior to December 31, 2011, ALJ

14

Knight evaluated Daphne's symptoms (e.g., "problems with concentration and being around

other people" and "not wanting to leave her home and not wanting to be around others") and

whether her symptoms could reasonably be accepted as consistent with the medical findings. R.

519–20; *see* 20 C.F.R. § 404.1529. To this point, ALJ Knight concluded that while Daphne's

MDIs "could reasonably be expected to produce the alleged symptoms[,] . . . [Daphne]'s

statements concerning the intensity, persistence and limiting effects of these symptoms [were]

not entirely consistent for the reasons explained in [the ALJ's] decision." R. 520. ALJ Knight

concluded that "while [Daphne] did receive some medication treatment for her [depression and

bipolar disorder], the record fails to corroborate the extent of limitation she alleges." *Id.* ALJ

Knight elaborated that Daphne's testimony about her limitations was inconsistent with the

medical records related to her depression and bipolar disorder. R. 522. ALJ Knight noted that

although Daphne alleges a severe impairment and she received five days of inpatient treatment

several years before her AOD, she "did not require further inpatient mental health care during the

period relevant to this decision," the "mental status portions of examinations did not show

irregularities," and Daphne described herself as being in good health after her DLI. R. 521–22.

She then noted that Daphne "reported difficulty leaving her home and being around others . . .

but . . . she was able to grocery shop, socialize with her son, and attend medical visits" and

"[p]roviders described her as pleasant." R. 522 (citing R. 202–254, 260–462). She also noted that

Daphne reported difficulties with concentration, but she "was able to cook, clean, take care of

her personal needs independently, manage her finances, and read and watch television, all of

which require a level of sustained attention and concentration." *Id.* Thus, ALJ Knight concluded

that:

> Although [Daphne] has experienced some symptoms due to her [mental]
> impairments, the objective findings in the record, the conservative care she has

received, and her admitted ability to perform a variety of daily tasks all suggest that these symptoms did not impose more than a minimal effect on her ability to perform work-related activities and were not as [functionally] limiting as she claims.

*Id.*

ALJ Knight then considered the four broad areas of mental functioning in § 12.00B of the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1, also known as the "paragraph B" criteria. R. 522–23. She found that Daphne's depression and bipolar disorder, R. 522, caused "mild" limitations in the first area (understanding, remembering, or applying information), second area (interacting with others), and third area (concentrating, persisting, or maintaining pace), but "no limitations" in the fourth area (adapting or managing yourself), R. 522–23 (citing R. 537–45, 202–254, 206–462).

More specifically, in understanding, remembering, or applying information, ALJ Knight acknowledged that Daphne reported "difficulty completing tasks," but found it inconsistent with her testimony that she could prepare meals, pay bills, count change, shop, drive, and read. R. 522 (citing R. 537–45, 202–254, 206–462). ALJ Knight also found that Daphne was able to provide information about her health history and respond to questions from medical providers. *Id.* ALJ Knight concluded by finding that "there is not any mention of any issues with [Daphne]'s immediate or remote memory." *Id.*

In interacting with others, ALJ Knight acknowledged Daphne's allegation that "she has difficulty engaging in social activities and spending time in crowds," but found it inconsistent with her testimony that she is able to get along with others, shop, and spend time with family. R. 522 (citing R. 537–45, 202–254, 206–462). Moreover, ALJ Knight found that Daphne had a good rapport and interactions with providers and non-medical staff, all of whom described her was pleasant and cooperative. *Id.* ALJ Knight concluded by finding that, even post-DLI, Daphne

was "cooperative" during her exam and "did not exhibit evidence of evasiveness, suspiciousness, or hostility." *Id.*

In the ability to concentrate, persist, or maintain pace, ALJ Knight acknowledged Daphne's position that she had "limitations in concentrating generally and maintaining a regular work schedule," but found it inconsistent with her testimony that she was able to drive, prepare meals, watch television, read, and handle her own medical care. R. 522 (citing R. 537–45, 202–254, 206–462). ALJ Knight further found that "the record fails to show any mention of distractibility, and she was routinely noted to be alert and oriented to all spheres." *Id.*

In the ability to adapt or manager herself, ALJ Knight acknowledged Daphne's allegation that she had "difficulties managing her mood," but highlighted her testimony that she is able to handle self-care and personal hygiene. R. 523 (citing R. 537–45, 202–254, 206–462). ALJ Knight also found that Daphne was able to get along well with providers and staff and had "no problems with temper control. She did not exhibit behavioral abnormalities [on] examinations during the relevant period." *Id.* ALJ Knight acknowledged Daphne's inpatient stay in 2008, but emphasized that there "was no evidence of inpatient psychiatric care from the alleged onset date through the date last insured." *Id.*

ALJ Knight next considered Dr. McClain's and Dr. Montgomery's medical opinions from 2018. R. 523 (citing R. 83–89, 92–101). She noted that both DDS reviewers found "insufficient evidence" to evaluate the degree of Daphne's functional loss related to her depression and bipolar disorder during the relevant time. *Id.* She also noted that, even with "insufficient evidence," Drs. McClain and Montgomery "listed" Daphne's depression and bipolar disorder as "severe" MDIs before her DLI. R. 523. ALJ Knight concluded that these opinions were not persuasive, for three reasons. *Id.* First, "the record now contains sufficient

evidence upon which to base a functional assessment" before Daphne's DLI. Second, Drs. McClain and Montgomery "failed to provide adequate support for finding [Daphne]'s impairments severe." *Id.* On the contrary, they "described the evidence as being *insufficient* to evaluate [Daphne]'s impairments fully, which demonstrates that they would have been *unable to determine* if [Daphne]'s impairments more than minimally affected her ability to perform work activities prior to the [DLI]." *Id.* (emphasis added). Third, the "available evidence" discussed elsewhere in the ALJ's decision—including Daphne's statements, normal findings on mental-status exams, and the conservative nature of her mental-health treatment—was "not consistent with" a finding that Daphne's MDIs were "severe" before her DLI. *Id.*

Lastly, ALJ Knight considered Dr. Russell's findings and opinion from November 2012. R. 524. ALJ Knight noted Dr. Russell's opinion that Daphne "has the intellectual ability to perform detailed and complex tasks, but, due to her depressed mood, difficulty concentrating, and preoccupation with her own misery, it is unlikely that she would be able to perform such tasks consistently." R. 524. ALJ Knight further summarized Dr. Russell's opinion that Daphne's "depressed mood and accompanying symptoms would probably preclude her from completing a normal workday or workweek without interruptions," and that "she appears fully capable of accepting instructions from supervisors and interacting with coworkers and the public." *Id.* ALJ Knight concluded that Dr. Russell's opinions were not persuasive because the exam was eleven months after the DLI and any link to a pre-DLI condition "appears to be base[d] off [Daphne]'s subjective statements alone," the findings were inconsistent with other evidence, and there was limited support for the findings. *Id.* ("Considering the date of Dr. Russell's examination, its inconsistency with the other evidence, and the limited support, the undersigned does not find this opinion persuasive.").

18

B.      *Analysis*

   1.      *The ALJ's step 2 finding is supported by substantial evidence.*

Daphne first argues that ALJ Knight violated the *de minimis* standard for severity at step

two in finding that her depression and bipolar disorder were not severe, either singly or in

combination with each other. Pl.'s Br. 7–8. In other words, Daphne asserts that there was not

substantial evidence to support ALJ Knight's conclusion that her depression and bipolar disorder

were not severe. *Id.*

At step two, an impairment or combination of impairments "do[es] not alone entitle a

claimant to disability benefits; '[t]here must be a showing of related functional loss'" to establish

that the impairment(s) are severe. *Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir.

2011). When, like here, a claimant alleges a mental impairment, the ALJ must assess the severity

using the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). *Patterson v. Comm'r of

Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1520a). Under this

technique, the ALJ will analyze four broad functional areas and "rate the degree of the functional

limitation resulting from the impairment(s)." 20 C.F.R. § 404.1520(b)–(c). The four broad

functional areas are: (1) understand, remember, or apply information; (2) interact with others; (3)

concentrate, persist, or maintain pace; and, (4) adapt or manage oneself. *Id.* § 404.1520a(c). The

ALJ uses a five-point scale to rate the degree of limitation: none, mild, moderate, marked,

extreme. 20 C.F.R. § 404.1520a(c)(4). After rating the degree of functional limitation in the four

categories, the ALJ must determine whether the claimant's mental impairments are "severe." *Id.*

§ 404.1520a(d). As stated above, an impairment is not severe if it has "no more than a minimal

effect on the individual's ability" to do basic work activities. *Koisch*, 650 F. Supp. 2d at 484

n.14; *see also* SSR 85-28, 1985 WL 56856, at *3."Basic work activities" are "the abilities and

aptitudes necessary to do most jobs," like: "understanding, carrying out, and remembering simple instructions;" using judgment; "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b)(3)–(6). If a claimant's functional limitation is rated as "none" or "mild," their mental impairment(s) will "generally" be considered "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities . . . ." 20 C.F.R. § 404.1520a(d)(1).

Here, ALJ Knight applied the correct legal standard and her conclusion that Daphne's depression and bipolar disorder were not severe is supported by substantial evidence. First, she properly applied the "special technique" for Daphne's depression and bipolar disorder. *See* R. 522–23 (analyzing 20 C.F.R. § 404.1520a and rating four broad functional areas). Second, considering the evidence in the record, ALJ Knight's conclusion is supported by substantial evidence. As to Daphne's ability to understand, remember, or apply information, ALJ Knight acknowledged Daphne's statement that she has difficulty completing tasks, but highlighted Daphne's testimony that "she could prepare meals, pay bills, shop, drive, and read," her ability to "provide information about her health [and] respond to questions from medical providers," and the medical findings that she has no issues with "short- or long-term memory." R. 522 (citing Hearing Testimony; Exhibits 1F-4F; 6F). As to Daphne's ability to interact with others, ALJ Knight acknowledged her statements that she had difficulty engaging in social activities and spending time in crowds, but highlighted Daphne's statements that she is "able to get along with others, shop, and spend time with family," her "good rapport with providers" and non-medical staff, and Dr. Russell's finding that she was "cooperative" and "did not exhibit evidence of evasiveness, suspiciousness, or hostility." *Id.* (citing Hearing Testimony; Exhibits 1F-4F; 6F). As

to Daphne's ability to concentrate, persist, or maintain pace, ALJ Knight recognized Daphne's statements that "she has limitations in concentrating generally and maintaining a regular work schedule," but emphasized Daphne's other statements that she is "able to drive, prepare meals, watch television, read, and handle her own medical care," the lack of medical evidence mentioning distractibility, and that she was "routinely noted to be alert and oriented to all spheres." *Id.* (citing Hearing Testimony; Exhibits 1F-4F; 6F). As to Daphne's ability to adapt or manage herself, ALJ Knight acknowledged Daphne's assertions that "she has difficulties managing her mood" and her 2008 inpatient treatment, but highlighted Daphne's statements that "she is able to handle-self-care and personal hygiene," the medical findings that Daphne had "no problem getting along well with providers and staff and no problems with temper control," and that "there is no evidence of inpatient psychiatric care." R. 527. ALJ Knight weighed conflicting evidence between some of Daphne's statements on the one hand and the medical records and Daphne's different statements on the other hand, finding only mild limitations. Her analysis "built 'an accurate and logical bridge' from the evidence to h[er] conclusions, and [the Court] is not left to guess at how [s]he arrived from one to the other." *Hunt v. Comm'r of Soc. Sec.*, No. 3:21-cv-111, 2022 WL 17839811 (W.D.N.C. Dec. 21, 2022) ("Without more from Plaintiff, it appears the evidence of record supports the determinations of the ALJ . . . that Plaintiff's impairments are non-severe."); *Stephens v. Colvin*, No. 6:15-cv-44, 2017 WL 773741, at *4 (W.D. Va. Jan. 30, 2017) ("The ALJ's conclusion that [claimant]'s mental impairments . . . are not 'severe' impairments is supported by substantial evidence in the record."), *adopted*, 2017 WL 766913 (W.D. Va. Feb. 27, 2017). Her conclusion was reasonable. *See, e.g.*, *Parker v. Comm'r of Soc. Sec.*, No. 6:16-cv-58, 2018 WL 1309741, at *5 (W.D. Va. Mar. 13, 2018) (finding that "substantial evidence supports the ALJ's conclusion that [claimant]'s mental

impairments were non-severe" where claimant's "statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible"); *Hakey v. Astrue*, No. 5:09-cv-22, 2010 WL 1740790, at *5 (W.D. Va. Apr. 27, 2010) (finding that claimant's mental impairments were non-severe where "the record contains no objective evidence that the plaintiff's mental impairment significantly limits her ability to perform basic work activities")*, adopted*, 2010 WL 2025763 (W.D. Va. May 18, 2010).

This Court may not overturn an ALJ's decision that is otherwise supported by substantial evidence merely because the record contains "conflicts in the evidence." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) ("We must sustain the ALJ's decision, even if we disagree with it, provided the determination is supported by substantial evidence . . . . The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."); *Hancock*, 667 F.3d at 472 ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.").

2.     *The ALJ's evaluation of the medical opinion evidence is supported by substantial evidence*.

Daphne contends that the ALJ erred in rejecting the DDS opinions, which found that she had severe impairments, as unpersuasive. Pl.'s Br. 6–8. According to Daphne, her 2008 hospitalization and 2012 exam with Dr. Russell were cited in DDS's opinion; thus it was error to find that "they failed to provide adequate support for finding [Daphne's] impairments severe." *Id.* at 7–8.

ALJ Knight was not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative medical finding(s)."[4] *See* 20

---

[4] Because Daphne's claim was filed after March 27, 2017, the ALJ was required to apply 20 C.F.R. § 404.1520c. *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023).

C.F.R. § 404.1520c(a). Under 20 C.F.R. § 1520c(c), an ALJ must consider the following factors in evaluating the persuasiveness of medical opinions: "(1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like a physician's familiarity with the evidentiary record or their understanding of the SSA's policies and evidentiary requirements." *Oakes*, 70 F.4th at 212. "Supportability" and "consistency" are the most important factors in determining the persuasiveness of medical opinions. *Id.* As such, the ALJ is only required to "explain how [she] considered the supportability and consistency factors" and is "not required to [] explain how [she] considered the [other] factors . . . ." 20 C.F.R. § 404.1520c(b)(2).

"Supportability is the degree to which a [source] supports their opinion with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" in the ALJ disability determination. 20 C.F.R. § 404.1520c(c)(1). "[C]onsistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. 404.1520c(c)(2)). *Id.* "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim [record], the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be" in the ALJ's disability determination. 20 C.F.R. § 404.1520c(c)(2). Evidence is "inconsistent 'when it conflicts with other evidence, contains an internal conflict, [or] is ambiguous.'" *Oakes*, 70 F.4th at 213 (citing 20 C.F.R. 404.1520b(b)). As

23

long as the ALJ applied the correct legal standard, the court should not disturb an ALJ's

weighing of the medical opinion evidence "absent some indication the ALJ dredged up 'specious

inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting *Scivally v.*

*Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).

 As to the supportability, ALJ Knight noted that the DDS psychologists "fail[ed] to

explain why they listed any impairment as severe." In other words, the DDS opinions were "not

supported by explanation or contemporaneous treatment records." *See Robert C. v. Comm'r of*

*Soc. Sec. Admin.*, No. 6:21-cv-9, 2022 WL 4838166, at *4 (W.D. Va. Aug. 23, 2022), *adopted*,

2022 WL 4773511 (W.D. Va. Sept. 30, 2022). When asked to rate the degree of Daphne's

functional limitations within the four paragraph B categories, Drs. McClain and Montgomery

both concluded that there was "insufficient evidence" to provide an opinion prior to Daphne's

DLI. R. 87, 98. The paragraph B criteria are used to determine whether a mental impairment is or

is not "severe." 20 C.F.R. § 404.1520a(a). Considering the DDS evaluators' assessment that

there was insufficient evidence to support a finding in all of these categories, the ALJ could

reasonably question the basis for their finding that Daphne had a "severe" impairment. *Cf. Janice*

*H. v. O'Malley*, No. 3:22-cv-630, 2024 WL 1364764, at *9 (E.D. Va. Jan. 5, 2024) (ALJ

reasonably found medical opinion to be unpersuasive when "[a]ll together, [the medical

practitioner] provided scant . . . support" for conclusion that claimant's mental impairments

caused work-preclusive limitations), *adopted*, 2024 WL 1376216 (E.D. Va. Mar. 29, 2024);

*Robert C. v. Comm'r of Soc. Sec. Admin.*, No. 6:21-cv-9, 2022 WL 4838166, at *4 (W.D. Va.

Aug. 23, 2022) (affirming ALJ's analysis under 20 C.F.R. § 404.1520c(c)(1) where medical

provider's opinion "was not supported by his own medical notes and lacked explanation to

support his proposed limitations"), *adopted*, 2022 WL 4773511 (Sept. 30, 2022).

Moreover, although Daphne does not argue that ALJ Knight erred in evaluating the consistency of the DDS opinions, the Court notes that ALJ Knight properly addressed the consistency factor. R. 523. As discussed above, ALJ Knight considered inconsistencies between Daphne's statements and the medical evidence and credited certain evidence showing that Daphne had no more than mild limitations. R. 522–23. The ALJ determined that "the available evidence is not consistent with finding any of the [Daphne's] impairments were severe prior to [her] date last insured, and the [DDS evaluators'] determinations fail to explain why they listed any impairment as severe." R. 523. Daphne disagrees with the ALJ's conclusions, but her "citations to contradictory statements in the medical records," Pl.'s Br. 7 (citing R. 86), is equivalent to asking the court to reweigh the evidence, which is not its role. *Hancock*, 667 F.3d at 472. The ALJ reasonably explained why she found that the DDS evaluators' opinions lacked supportability and consistency. The Court finds no reversible error in this conclusion. *See Janice H.*, 2024 WL 1364764, at *10.

Daphne next asserts numerous errors with ALJ Knight's finding that Dr. Russell's opinion is unpersuasive. Pl.'s Br. 8. None are persuasive.

First, Daphne argues that ALJ Knight erred in "rejecting Dr. Russell's post-DLI report" because there was "abundant linkage between [her] pre-DLI condition and her post-DLI condition." *Id.* at 8–9. However, this misstates ALJ Knight's conclusion. ALJ Knight did not reject Dr. Russell's exam because it was post-DLI. Instead, ALJ Knight considered Dr. Russell's opinion but, found it unpersuasive because it was inconsistent with other evidence and lacked support. R. 524.

Second, Daphne argues that it was "spurious" to reject Dr. Russell's exam on the ground that "he appears to base [his opinion] off of [Daphne]'s subjective statements alone." Pl.'s Br. 9.

Daphne asserts that "Dr. Russell did not rely on [Daphne]'s statements alone; he is a trained psychologist and evaluated King's entire presentation – not only what she said but how she said it." *Id.* Daphne's argument misstates the ALJ's explanation. The ALJ questioned Dr. Russell's finding that Daphne's "symptoms were likely present since her second marriage separation or before" because it was based "off of [her] subjective statements alone." R. 524. Dr. Russell's report does not cite other medical records or evidence to support this assessment. *See* R. 253. He once mentioned "the referral material," R. 253, but he never discussed it. Every detail that Dr. Russell cited in the sections, "Historical Material" and "Present Functioning" he attributed to his interview of Daphne and her report. *See* R. 249–51. Because Dr. Russell did not identify any medical records, social history records, or any information other than Daphne's subjective reports as a factual basis for his finding that Daphne "has had difficulty dealing with everyday stressors and social demands since the dissolution of her second marriage," R. 253, the ALJ reasonably determined that Dr. Russell relied solely on Daphne's subjective statements to support his assessment that Daphne's mental-health "symptoms were likely present" before her DLI, R. 252. *Cf. Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'").

However, the ALJ provided other reasons for determining that Dr. Russell's opinion was inconsistent with the evidence and had limited support. The ALJ found that Daphne did not seek mental health treatment during the relevant period other than obtaining medication from her primary care physician, who noted no "significant abnormalities in her mental status examinations." R. 524. Daphne's reported activities of daily living showed that she was not limited in performing tasks and completing a normal workday and workweek as Dr. Russell

assessed. *Id.* Dr. Russell's examination findings do not support his assessed limitations. *Id.*
Daphne takes issue with most of these findings.

Daphne argues that ALJ Knight erred in concluding that Dr. Russell's report is
unpersuasive because she "did not seek treatment at a level consistent with the significant
limitations [he] describe[d]." Pl.'s Br. 9 (citing R. 524). According to Daphne, "the ALJ may not
draw an adverse inference from such evidence 'without considering possible reasons he or she
may not comply with treatment or seek treatment consistent with the degree of his or her
complaints.'" *Id.* (quoting SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016)). The record
does not show that Daphne sought a higher level of care, but was declined treatment because she
could not afford it or abandoned treatment because it was too expensive. The record also does
not contain any recommendations from a medical provider during the relevant period that
Daphne seek higher level care for her mental impairments or take more costly medications. R.
521 ("She said that she was not currently taking any psychiatric medications because she was
unable to afford them."). Accordingly, ALJ Knight could reasonably determine that Daphne's
minimal mental health treatment consisting only of medications from her primary care physician
provided evidence that was inconsistent with Dr. Russell's assessed limitations. *Cf. Dunn*, 607 F.
App'x at 274 (noting that if a plaintiff requires only "conservative treatment, it is reasonable for
an ALJ to find that the alleged disability is not as bad as the claimant says it is"); *Cameron R.S.
v. Comm'r of Soc. Sec.*, No. 4:21-cv-116, 2022 WL 19350585, at *8–9 (E.D. Va. June 13, 2022)
(affirming ALJ's analysis under 20 C.F.R. § 404.1520c where ALJ emphasized the conservative
course of mental-health treatment), *adopted*, 2023 WL 2746026 (E.D. Va. Mar. 31, 2023), *aff'd*,
2023 WL 8826951 (4th Cir. Dec. 21, 2023).

Daphne argues that it was error for ALJ Knight, a layperson, to find that Daphne "did not

require inpatient psychiatric care . . . ." Pl.'s Br. 10. According to Daphne, the word "require" makes this a medical opinion. *See id.* "[T]he fact that the ALJ is a layperson does not mean that she cannot assess the medical evidence." *Tabethia T. v. Comm'r of Soc. Sec.*, No. 2:21-cv-26, 2022 WL 2127703, at *10 (E.D. Va. Apr. 7, 2022) (citing *Felton-Miller*, 459 F. App'x at 230–31). The record does not show that Daphne received inpatient psychiatric care during the relevant period or that a medical provider recommended inpatient care. *See generally* R. 202–462. ALJ Knight merely concluded that based on the lack of inpatient psychiatric care, Daphne did not require it. This is a reasonable conclusion. As such, ALJ Knight's conclusion that Daphne did not require inpatient psychiatric care is supported by substantial evidence, *Felton-Miller*, 459 F. App'x at 228 (holding that a similar argument was "without merit"), and was a proper consideration, *see Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts . . . .").

Daphne argues that ALJ Knight's finding that Daphne's "primary care provider did not describe significant abnormalities in her mental status during examinations," is error "because it ignores that the mental status evaluations . . . were pro forma and perfunctory to begin with." ECF No. 13, at 10. Nothing in the Record requires the ALJ to agree with Daphne's characterization of her primary care provider's treatment notes. As noted, the ALJ must consider all relevant medical evidence. *Lewis*, 858 F.3d at 869. Daphne's primary care provider's examination findings were the only contemporaneous observations of her mental status during the relevant period, and the ALJ accurately discussed them. It was not error for the ALJ to credit those findings.

Daphne also argues that ALJ Knight's finding that Daphne can "shop, care for her personal needs, clean, drive, read, count change, and spend time with family," as a matter of law,

"does not refute Dr. Russell." Pl.'s Br. 10. "ALJs may consider daily activities when evaluating symptoms." *Oakes*, 70 F.4th at 216 (citing 20 C.F.R. § 404.1529(c)(3)(i)). "However, the ALJ "may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [they] can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). For example, an ALJ errs in extrapolating from daily and life activities that a claimant has . . . the 'ability to do sustained work-related activities on a regular and continuing basis—i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Oakes*, 70 F.4th at 216. The ALJ did not overstate the nature of Daphne's activities in this case. Instead, she cited Daphne's modest daily and life activities as evidence of functioning that was inconsistent with Dr. Russell's significant limitations, including that Daphne would have difficulty performing even simple repetitive tasks. Accordingly, "the ALJ considered the extent of [Daphne]'s daily activities in assessing her statements regarding the severity of her symptoms." *Kristin W. v. O'Malley*, No. 7:22-cv-692, 2024 WL 1342599, at *9 (W.D. Va. Mar. 29, 2024). The ALJ reasonably relied on Daphne's activities as one piece of evidence that was inconsistent with Dr. Russell's limitations.

As to the supportability of Dr. Russell's opinion, ALJ Knight noted that Dr. Russell's own exam "does not support the limitations he describes." R. 524. For example, ALJ Knight noted Dr. Russell's opinion that Daphne was unable to perform simple repetitive tasks on a consistent basis, but highlighted that she "was able to complete the examination," "there was no evidence of distractibility," and she "was cooperative, and she demonstrated good immediate and remote memory as well as calculation." *Id.* Although Dr. Russell identified Daphne's "difficulty concentrating" as a reason for his opinion, Dr. Russell did not document any observed concentration deficiency in his mental status assessment. ALJ Knight adequately addressed

  
supportability by highlighting the lack of "objective medical evidence and explanation" for Dr. Russell's functional limitations. 20 C.F.R. § 404.1520c(c)(1).

As to the consistency of Dr. Russell's opinion, ALJ Knight noted how Dr. Russell found significant limitations, but highlighted that Daphne did not seek care from a mental health provider or need inpatient psychiatric care. *Id.* (citing Exhibits 1F; 4F). ALJ Knight also emphasized that Daphne said "she was able to shop, care for her personal needs, clean, drive, read, count change, and spend time with family members . . . which shows that she was not as limited in performing tasks and completing a normal workday . . . as Dr. Russell indicates." R. 540–42 (citing Exhibits 1F; 4F). ALJ Knight adequately addressed consistency by emphasizing that Dr. Russell's assigned limitations (e.g., trouble performing simple repetitive tasks), R. 253, are inconsistent with the level of treatment sought by Daphne and her primary care providers conclusion that there were not significant abnormalities in her mental status during examinations. *See* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion . . . is with evidence from other medical sources and nonmedical sources . . . the more persuasive the medical opinion . . . will be."). Moreover, even though Dr. Russell prescribed these significant limitations, he noted that "with some mental health treatment her depressed mood can improve." R. 253. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Thus, as outlined above, ALJ Knight "appropriately evaluated the persuasiveness of" the medical opinions. *Stacy A. v. Kijakazi*, No. 23-0089, 2023 WL 6809838, at *3 (D. Md. Oct. 16, 2023).

Each of the ALJ's reasons is adequately supported by the record and provides some basis to support her assessment that Dr. Russell's opinion lacked consistency and supportability. Considering those reasons together, I find that the ALJ's determination that Dr. Russell's opinion

is not persuasive is supported by substantial evidence.

### IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**AFFIRM** the Commissioner's final decision dated March 6, 2023.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: February 24, 2025

Joel C. Hoppe
United States Magistrate Judge